598 So.2d 1110 (1992)
Jo Ann PAGE
v.
Melissa T. GILBERT, et al.
No. 89-CA-1662.
Court of Appeal of Louisiana, Fourth Circuit.
March 31, 1992.
Rehearing Denied June 17, 1992.
*1112 Darryl J. Carimi, James C. Klick, Carimi Law Firm, Metairie, for plaintiff-appellant.
Calvin G. Norwood, Jr., Margaret Diamond, McGlinchey, Stafford, Mintz, Cellini & Lang, New Orleans, Paul V. Cassisa, Sr., Carl J. Giffin, Jr., Paul V. Cassisa, Jr., Bernard, Cassisa, Saporito & Elliott, Metairie, for defendants/appellants.
Thomas L. Gaudry, Jr., Keith G. Contreary, Windhorst, Gaudry, Talley & Ranson, Gretna, for defendants/appellants.
Before BARRY, CIACCIO, ARMSTRONG and JONES, JJ., and GULOTTA, J. Pro Tem.
JAMES C. GULOTTA, Judge Pro Tem.
This appeal arises from an award for personal injuries sustained in an automobile accident. On January 5, 1983, at approximately 6 a.m., Melissa Gilbert attempted to pass an automobile and a tractor/trailer truck in a no-passing zone on a 2-lane highway in Plaquemines Parish. As a result, a head-on collision occurred involving the Gilbert vehicle and a 1983 Nissan Pulsar NX driven by the plaintiff, Jo Ann Page. The rates of speed at the time of impact are disputed. However, the record supports a conclusion that both automobiles were traveling between 35 and 40 mph. Page suffered severe injuries, primarily to the lower extremities including the hips, legs and foot.
On April 4, 1984, Page filed suit initially against Melissa Gilbert; Aetna Casualty and Surety, Co., Gilbert's insurer; Alan Williams, the driver of a truck that Gilbert illegally passed; the owner of the truck and its insurer; and State Farm, the uninsured motorist insurer of the Page vehicle. Thereafter, on September 10, 1984, plaintiff amended her petition to include Nissan Motor Corporation, U.S.A. and the State of Louisiana through the Department of Transportation as party defendants. This amended petition alleges that because of a defect in design and construction, Nissan was guilty of negligence which constituted a "cause" of plaintiff's injuries. In a third amending petition, plaintiff named Nissan *1113 Motor Co., Ltd. as a defendant and in a fourth amending petition, Page asserts that she was pregnant at the time of the accident and her unborn child, Joshua Stovall, sustained injury.
A jury found in favor of plaintiff and against Gilbert and Nissan. Fault was apportioned, 30% to Gilbert and 70% to Nissan. The jury awarded damages in the amount of $2,750,000.00, including specials, to Page individually and an additional $750,000.00 to Page on behalf of her minor child, Joshua. In a bifurcated trial, the trial judge dismissed plaintiff's suit against the State and the Department of Transportation. In response to defendant's motion for judgment notwithstanding the verdict and for remittitur, the trial judge granted a JNOV denying recovery for Joshua Stovall. The basis of the trial judge's reasons for denying recovery for Joshua was the failure by plaintiff to show a causal connection between the child's disability and the accident.
In those reasons the trial judge went on to say, regarding the uncrashworthiness of the Page vehicle, that the design of the Nissan vehicle was "defective and presented an unreasonable risk of harm to Ms. Page given its ordinary use." He further stated that the Page vehicle was defective because "the longitudinal member (beam) in Ms. Page's Nissan ended under the driver's seat and in the instant crash buckled up under the driver's seat thrusting the driver forward and up into the dash." The trial judge went on to say Nissan did not show that the particular beam determination point under the vehicle served any useful purpose. He further found the beam configuration was an unreasonable risk of harm and that in a crash at the speeds indicated in the instant case there is an anticipated and known risk. Nissan, Gilbert, Aetna and Page, on behalf of her son Joshua Stovall, have appealed.
The primary arguments in Nissan's appeal relate to proof of the defective design and construction of the Nissan vehicle and whether this defect enhanced plaintiff's injuries; the apportionment of fault as determined by the jury; quantum as to Page's special and general damage award; and, damage and injury to Joshua Stovall, an unborn child at the time of the accident. An additional issue is the question of prescription regarding whether Nissan's liability, if indeed it is liable, is in solido with Gilbert.
Nissan claims that plaintiff has failed to carry the burden of proof in this products liability crash unworthiness case. Relying on Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1984), and Lavespere v. Niagara Machine and Tool Works, Inc., 910 F.2d 167 (5th Cir.1990), Nissan argues that to establish a claim for damages in these cases, a plaintiff must show that the vehicle was unreasonably dangerous in design, that the design defect caused or enhanced the injury, and that the gravity of the injury outweighed the feasibility of adopting an alternative, utilitarian design. Nissan further claims a plaintiff must also show that the alternative design would have prevented or lessened plaintiff's injuries. See LSA-R.S. 9:2800.56. Nissan finally argues that the trial judge erred in failing to maintain its plea of prescription. According to Nissan, a suit directed against it twenty months after the date of the accident is prescribed where Nissan is not solidarily liable with other defendants.
The thrust of Gilbert's appeal is that the jury and trial judge erred in assessing 30% fault to her where the evidence supports a conclusion that 95% of plaintiff's injuries were caused by Nissan's negligent design and construction of an uncrashworthy vehicle. Gilbert further claims the jury abused its discretion in awarding an excessive amount to plaintiff.
Plaintiff appealing seeks reinstatement of the jury verdict awarding to her, as tutrix of her minor child, Joshua Stovall the $750,000 award which was set aside in the trial judge's decision on the judgment notwithstanding the verdict.

CRASHWORTHINESS
On the subject of crashworthiness, Louisiana jurisprudence and the 1988 enactment of the Louisiana Products Liability *1114 Act, LSA-R.S. 9:2800.51 et seq. provide some guidance.
This Court in Armstrong v. Lorino, 580 So.2d 528 (4th Cir.App.1991), was confronted with a "crashworthiness" case involving General Motors Corporation. In Armstrong the plaintiffs filed suit against General Motors for the death of their son resulting from an intersectional automobile accident. The suit against GM alleged that the locking mechanism in the front seat-back failed or malfunctioned causing a rear seat passenger to be thrown forward crushing the driver between the seat and the steering wheel. Plaintiff asserted in Armstrong that the defective seat-back enhanced their son's injuries resulting in his death. In Armstrong we affirmed the trial court's directed verdict on behalf of GM dismissing plaintiff's suit. According to the Armstrong court, plaintiff failed to show that the latching mechanism was in fact defective. The Armstrong court stated that a plaintiff in uncrashworthiness cases is required to prove the GM automobile was defective, having a flaw or imperfection which made the car unreasonably dangerous when in normal use. The Court further defined the term "crashworthiness" as the "ability of a motor vehicle to protect the passenger from exacerbated injuries after a collision". See Huddell v. Levin, 537 F.2d 726, 735 (3rd Cir.1976).
In Higginbotham v. Ford Motor Company, 540 F.2d 762 (1976), the U.S. 5th Circuit Court of Appeal was confronted with a "crashworthiness" or "second impact" case. In that matter the court concluded the evidence was sufficient to sustain a finding that the automobile was not reasonably suited for the purposes for which it was intended. The Higginbotham court was confronted with an automobile accident similar to the instant case, i.e., a left front to left front accident. The crashworthiness defect involved in Higginbotham was a failure of design, which upon impact, caused the engine to invade the front passenger's seat when a left frame rail bent causing the death of the front seat occupant. The Higginbotham case grew out of an accident which occurred in the state of Georgia and the Federal Court in that case was interpreting Georgia's statutory law and jurisprudence. Interesting, however, is the fact the Higginbotham court stated that Georgia was a strict liability state, as is Louisiana, and recognized the theory and apportionment of recovery for enhancement of injuries in a crashworthiness or second impact cases.
In Halphen v. Johns-Manville Sales Corp., the Louisiana Supreme Court, on certification from the U.S. 5th Circuit Court of Appeals, was confronted with the question ... "[i]f plaintiff proved that the product was unreasonably dangerous per se either because of defective design or defective composition or construction could a manufacturer be held liable even though that manufacturer did not know or could reasonably not have known of the danger?" In the Halphen case the Court was concerned with a suit by a widow for the death of her husband caused by exposure to asbestos. The Louisiana Supreme Court responded to the certified question in the affirmative. It stated that a plaintiff must prove that the harm resulted from the condition of the product, that the product was unreasonably dangerous to normal use and that the condition existed at the time the product left the manufacturer's control. The Court further elaborated by stating that a product is unreasonably dangerous per se, if a reasonable person would conclude the danger-in-fact of the product, whether foreseeable or not, outweighs the utility of that product. According to the opinion in Halphen, the same test is applicable in defective design cases. The Halphen court then concluded that strict liability applies in these cases.
In 1988 the Louisiana Legislature enacted the Louisiana Products Liability Act, LSA-R.S. 9:2800.51 et seq. This statute eliminated the category of things unreasonably dangerous per se and overruled portions of Halphen. The Act states in pertinent part as follows:
§ 2800.54 Manufacturer responsibility and burden of proof
A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the *1115 product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.
B. A product is unreasonably dangerous if and only if:
(1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;
(2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;...
§ 2800.56
A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:
(1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and
(2) The likelihood that the product's design would cause the claimant's damage and the gravity of the damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product.
It is clear that this legislative enactment sets forth a more stringent burden of proof for a products liability plaintiff than did Halphen and its progeny. See Truat v. Uniroyal, Inc., 555 So.2d 655 (La.App. 4th Cir.1989).
In the 1990 U.S. 5th Circuit Court of Appeal's case of Lavespere v. Niagara Mach. and Tool Works, Inc., 920 F.2d 259 (5th Cir.1990) the court was confronted with allegations that injury to an employee's hand was caused by a defectively designed "press break" used by a manufacturer to cut or bend metal parts.
Because of the time frame of the accident in Lavespere as it related to the adoption of the 1988 statute and the holding of Halphen in February 1986, the Court was faced with the question of whether the burden of proof was that set forth in the 1986 Halphen case or the more stringent requirements contained in the 1988 statute. Concluding that burden of proof cases are procedural in nature, the Court applied retroactively the requirements of the 1988 Legislative Act. However, the Louisiana Supreme Court in Gilboy v. American Tobacco Company, 582 So.2d 1263 (La.1991), held, in a recent decision, that the Louisiana Products Liability Act, LSA-R.S. 9:2800.51 et seq., alters substantive rights and is not to be applied retroactively.
Where a change in settled law is procedural rather than substantive in nature, the statute will be applied retroactively. Riehm v. Kellogg, 520 So.2d 1169, writ granted, 523 So.2d 1331, writ dismissed, 530 So.2d 1164 (La.App. 4th Cir. 1987). Conversely, if the change in law relates to substantive rights, the new law will be applied only prospectively. LSA-C.C. art. 8.
Because plaintiff suffered injury prior to the adoption of the 1988 Act, we conclude, in conformity with the Supreme Court holding in Gilboy, that the burden of proof set forth in Halphen is applicable in the instant case.
Under the Halphen test for a plaintiff to recover in a products liability case, he or she must prove (1) the harm asserted resulted from the condition of the product, (2) the condition made the product unreasonably dangerous to normal use, and (3) the condition existed at the time it left the manufacturer's control.
Regarding the first test, plaintiff alleges in the instant case that because of a defective longitudinal beam under the driver's seat, plaintiff was thrown forward and upward causing an enhancement or aggravation of her injuries. Plaintiff also complains that the design defect caused the driver's compartment to collapse resulting in an exacerbation of her injuries.
In support of these allegations, plaintiff offered the testimony of Dr. Ronald Houston, a mechanical engineer, accepted as an expert in crashworthiness of a vehicle and biomechanical engineering. This expert testified that the "most obvious design defect" in the Nissan Pulsar driven by plaintiff was the length and configuration of the longitudinal beam ending under the driver's seat. Houston testified that it was the *1116 force of the accident that caused the compression of the occupant area, impacting Page's knees and pelvic area giving rise to an enhancement of her injuries. Specifically, Houston stated that the defective beam did not run the entire length of the undercarriage of the car but ended immediately behind the driver's seat. According to Houston, the short length of the beam not only provided less strength to the crash integrity of the vehicle but also buckled, thereby causing a buckling of the floorpan causing plaintiff to be thrown forward and upward. Houston stated, had the beam increased in steel strength and run the entire length of the car, plaintiff's injuries probably would not have been enhanced. According to Houston, this defect could have been remedied by improving the thickness of the metal of the beam and floorpan by approximately 125 pounds thereby "doubling" the strength of the automobile. This improvement, Houston testified, would amount to an additional cost of $30.22 in metal. Finally, Dr. Houston stated that because of the defective condition of the doorlatch, the force of the collision caused the driver's door to open thereby reducing the structural integrity of the passenger compartment.
Another plaintiff witness, Walter Levin, a representative of Calspan Corporation which conducts testing on automobiles added little or nothing to support plaintiff's case. This witness was responsible for setting up the test but did not interpret the data received from the testing. He did indicate, however, that the 1983 Nissan Pulsar passed the Calspan Corporation test.
Contradictory expert testimony was offered by Dr. Kenneth Sorenson and Everett Kennedy. They stated that from their perspective the Nissan vehicle was indeed crashworthy and free from any defects. Both of these expert witnesses felt that the beam was not defective in configuration and that the cause of plaintiff's injuries was solely and entirely the violent nature of the accident in the instant case. Kennedy testified that to determine the crashworthiness of a vehicle, the entire vehicle must be considered as a whole because each part is designed to react with another to provide safety to the occupants. To do otherwise, he stated, would be fundamentally erroneous.
We note, parenthetically, that there is no dispute that the Nissan vehicle in the instant case passed the Federal Motor Vehicle Safety Standard Test, the federal standard for automobiles.
The second test under the Halphen standard is that the condition of the product made it unreasonably dangerous for normal use. In that connection, we invite the inquiry as to whether anticipation of a serious automobile accident is "normal use".
The Louisiana Supreme Court in Bloxom v. Bloxom, 512 So.2d 839 (La.1987) held that parking a car in a barn, resulting in the catalytic converter exhaust system causing a fire, was "normal" use of a vehicle. The Bloxom court recognized that normal use of a product includes all reasonably foreseeable uses or misuses of a product. The court stated:
`normal use' is a term of art that includes all intended uses, as well as all foreseeable uses and misuses of the product. Rey v. Cuccia, 298 So.2nd 840 (La.1974); Branch v. Chevron Oil Co., Inc., 681 F.2d 426 (5th Cir.1982); Lebouef v. Goodyear Tire & Rubber Co., 623 F 2nd 985 (5th Cir.1980).
See also the holding in Boubel v. Gilardi, 532 So.2d 948 (La.App. 5th Cir.1988). Based on these holdings, we conclude that the occurrence of a serious automobile accident is a reasonably foreseeable use or misuse of that vehicle and therefore encompasses the concept of "normal use".
As to whether the product was "unreasonably dangerous" to "normal use", Houston testified that the configuration of the beam made the injuries sustained by the plaintiff a certainty in an accident of this sort. Accepting Houston's statement that this design would make plaintiff's injuries a certainty, it would not be clearly wrong to find the vehicle unreasonably dangerous for "normal use".
*1117 The third test under Halphen requires that the condition existed at the time it left the manufacturer's control. There is no dispute that the alleged design defects of the Nissan Pulsar when it left Nissan's control. Thus, we need not address this issue.
It is clear that there exists contradictory expert testimony in the instant case. Where expert witnesses differ, it is a matter of fact for the jury to determine the most credible evidence. State v. Wilco Construction Co., 393 So.2d 885 (La.App. 4th Cir.1981); Frederick v. General Motors Corp., 544 So.2d 757 (La.App. 3 Cir. 1989). Likewise, whether the harm asserted was caused by the condition or design of a product is a question of fact. This Court may not disregard the jury's factual findings even though it may have decided the case differently. Rosell v. ESCO, 549 So.2d 840 (La.1989). Rather, we may only set aside the jury's findings where there was manifest error or the findings were clearly wrong. Based on the aforementioned testimony, we find the jury had sufficient evidence to support the conclusion reached by it on the uncrashworthiness of plaintiff's automobile.
Significantly, the trial judge in reasons for denying a motion for new trial on Nissan's liability, stated:
"This Court does not doubt that the design of the Nissan Pulsar NX was defective and presented an unreasonable risk of harm to Ms. Page given its ordinary use. Any lay person could see that the longitudinal member (beam) in Ms. Page's Nissan ended under the driver's seat and in the instant crash buckled up under the driver's seat thrusting the driver forward and up into the dash ... that [beams] end under the driver's seat satisfies this Court that the jury did not abuse its discretion in so finding".

APPORTIONMENT OF FAULT
Nissan next asserts that the jury erroneously apportioned 70% fault to Nissan and 30% to Gilbert.
Proper review of the allotted percentage of fault requires that this Court determine from the record that the trial court finding is or is not clearly wrong or manifestly erroneous. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985); Canter v. Koehring Co., 283 So.2d 716 (La.1973); Arceneaux v. Dominque, 365 So.2d 1330 (La.1978).
Where it is determined the jury's apportionment of fault is clearly wrong, it is the Court's responsibility to "render any judgment which is just, legal, and proper upon the record on appeal." LSA-C.C.P. art. 2164. The standard for making such judgment is set forth in Watson which relies on the Uniform Comparative Fault Act, sec. 2(b), 12 U.L.A. 53 (1988 supp). See also Ingram v. Caterpillar Machinery Corp., 535 So.2d 723 (La.1988).
The Uniform Comparative Fault Act, Section 2(b) states, in pertinent part,
In determining the percentage of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the casual relation between the conduct and the damages claimed.
Considering the statutory guidelines, and the holding of the Louisiana Supreme Court in Watson and Ingram, we conclude that fault as determined by the jury was clearly wrong.
Obviously when one is involved in a head-on collision with both vehicles coming together with speeds between 35 to 40 mph, there exists a reasonable anticipation that serious injury would follow. As anticipated, both drivers did suffer serious injury. It is clear that the cause of the initial accident was the tortfeasor driver, Gilbert. Certainly had the vehicle not been defective, plaintiff, nonetheless, would have sustained serious injury from the violent impact of this collision where both vehicles were almost totally destroyed. On the other hand, as herein above pointed out, the record clearly supports a conclusion that plaintiff was seriously injured as a result of the defective condition of the Nissan automobile. There exists a direct correlation between the injuries to the lower extremities and pelvic area suffered by plaintiff *1118 and the defective condition of the Nissan vehicle.
Based on these considerations, we conclude that both Gilbert and Nissan are equally at fault for injuries suffered by Page. Having so concluded, we hold Gilbert to be 50% at fault and Nissan 50% at fault. See the recent case of Moore v. Chrysler Corp., 596 So.2d 225 (2d Cir. 1992).

QUANTUM
Nissan in its next assignment of error, asserts that the quantum awarded plaintiff was excessive.
Before a trial court award may be set aside as inadequate or excessive, the reviewing court must look first, not to prior awards, but to individual circumstances of the instant matter before it. Only after an analysis of the facts and circumstances peculiar to the instant case can a reviewing court determine the award is either excessive or inadequate. The reviewing court may not merely look at past awards for similar injuries in the determination of whether the trier of fact abused its much discretion. Reck v. Stevens, 373 So.2d 498 (La.1979).
It is clear that plaintiff has suffered excruciating pain, both physically and psychologically as a result of this accident. The jury awarded to her $2,750,000.00. It did not specify how much was designated as specials and what portion was awarded for pain and suffering. However, the record indicates that specific amounts were included in the award.
Past medicals were stipulated at $177,857.66. An economist estimated lost wages and benefits at $459,909.58. This amount included estimated future wage increases which were projected from the percentage of wage increases enjoyed by professional career women in Louisiana from 1959-1979.
Included in the award was an amount for the future services of an aid or attendant. Despite a lack of evidence regarding the necessity of plaintiff having the service of this aid to assist her, evidence was offered as to the cost for such assistance for the remainder of plaintiff's life. The estimate was $239,313.92. Future prescriptions were estimated at $23,120.71 based on the cost of plaintiff's prescription medicine consumption at the time of trial. The total special award amounts to $900,201.87.
We find the award for special damages excessive. We delete the $239,313.92 for a full time attendant which is not supported by the record. However, based on evidence that plaintiff is unable to be gainfully employed and the testimony of the economist, (assuming plaintiff's inability to be employed) we cannot say the $459,909.58 award for lost wages and benefits is excessive. We also affirm the award of $23,120.71 for future prescriptions.
Turning now to the general damage award, as we have stated, we recognize the severity of plaintiff's injuries.
At the time of the accident, plaintiff was 36 years of age. She was transported by ambulance from the scene of the accident to the hospital. As a result of this accident, Page suffered a fractured dislocation of the right hip, a transverse fracture of the left hip, a fractured kneecap, fractures to the right ankle and foot, and a tibial plateau. After the accident surgery was performed placing a pin in her left femur to facilitate traction, removal of her kneecap and repair of lacerated tendons surrounding the kneecap. She was in traction for several days. Traction did not satisfactorily reduce the hip fracture. Thereafter, Page underwent surgery to set the bone and had a plate with screws inserted to hold the joint together. However, approximately one week past surgery, plaintiff underwent a third surgical procedure, required because of a fall suffered by her while hospitalized. She remained hospitalized for approximately two months. She was discharged from the hospital on March 13, 1983. Because of chronic pain, a fusion was performed on her heel, foot, and ankle approximately three months after discharge from the hospital. As a result of the fusion, she cannot move her foot from side to side.
*1119 On June 8, 1987, a hip replacement was performed due to ossification, traumatic arthritis, and continued pain. She continues to suffer from intermittent pain for which she takes medication and has undergone physical therapy. Her mobility has significantly decreased, although there was no medical testimony as to percentage of residual disability. However, Dr. Anastasio, plaintiff's physician, stated that as a result of total hip replacement a majority of her pain and complaints have been resolved.
Although we recognize the severity of plaintiff's injuries nonetheless we conclude that a general damage award in the amount of $1,849,798.13[1] is excessive and an abuse of the jury's much discretion.
Having so concluded our jurisprudential review is limited to considering similar awards with a view of lowering the award to the highest amount that, based on the facts of the case, was within the jury's discretion. We may use prior decisions as an aid in determining the correct award. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
In Johnson v. Kansas City S. Ry., 531 So.2d 773 (La.App. 3rd Cir.1988), the plaintiff suffered massive head injury, was rendered quadriparetic, had both tibias and hips fractured, and suffered nerve damage. The plaintiff was hospitalized for two years, including rehabilitation and the fractured hip required fusing. The plaintiff was left 75% totally disabled. General damages were $2,000,000.00 and specials totalled $819,500.00. This plaintiff obviously sustained far more severe injuries yet was awarded almost the same amount as the instant plaintiff. (The injury was the result of a train-auto collision).

Lee v. Missouri Pac R.R. Co., 540 So.2d 287 (La.1989) involved a truck-train collision which resulted in a severely fractured hip, 4 broken ribs, and a ruptured spleen. The plaintiff underwent a hip replacement, with possible replacement in 10 years, and a splenectomy. The award was $225,000.00 in generals and $250,221.00 in specials.
In Brannon v. Shelter Mut. Ins. Co., 520 So.2d 984 (La.App. 3d Cir.1987), a plaintiff involved in an automobile accident suffered fractures of both arms, both ankles, a fractured hip and facial lacerations. Hospitalization lasted three months, injuries necessitated a hip replacement. General damages totalled $100,000.00, specials totalled $190,620.12.
The court in Melder v. State ex rel. Dep't. of Highways, 512 So.2d 546 (La.App. 3d Cir.1987), awarded an auto accident victim $497,501.14 in general damages and $141,499.86 in specials where there were multiple fractures of the right leg and a fractured pelvis and a subdural hematoma. The plaintiff underwent five surgeries and was hospitalized for thirty days.
Based on a review of the awards in similar cases, we find the highest general damage award within the jury's discretion to be $1,000,000.00.

PRESCRIPTION
The next issue in the instant case is a prescriptive one. Nissan argues that the trial judge erred in failing to maintain its plea of prescription. It asserts because Nissan is not solidarily liable with Gilbert, the suit against Nissan has prescribed. Nissan was joined as a party defendant approximately twenty months post-accident. LSA-C.C. art. 2324 provides:
"He who causes another to do an unlawful act,....is answerable in solido, with a person, for the damage caused by such act.
Persons whose concurring fault has caused injury, death or loss to another are also answerable, in solido...

Interruption of prescription against one joint tortfeasor ... is effective against all joint tortfeasors ..."
Because the suit was timely filed against the driver tortfeasor, Gilbert, and liability has been found to exist against Nissan and *1120 Gilbert, and because their combined fault contributed to plaintiff's injuries, we conclude that both are joint tortfeasors and as such solidarily liable. Having so concluded, we find no merit to Nissan's claim that the suit against it has prescribed.

JUDGMENT NOV
Plaintiff appeals on behalf of her minor son, Joshua Stovall, asserting that the trial judge erred in granting a judgment JNOV which set aside the jury award on behalf of Joshua in the sum of $750,000.00.
The standard for granting JNOV is set forth in Acosta v. Pendleton Memorial Hospital, 545 So.2d 1053 (La.App. 4th Cir. 1989) which states:
The standard for granting JNOV is the same used to determine whether a directed verdict should be granted. The standard of proof for deciding a JNOV requires that the trial court consider all evidence and reasonable inferences in the light most favorable to the party opposed to the motion and if facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes reasonable persons could not arrive at a contrary verdict, the motion should be granted. Blum v. New Orleans Public Service, Inc., 469 So.2d 1117 (La.App. 4 Cir.), writ denied, 472 So.2d 921 (La. 1985); In deciding whether to grant a JNOV, the court cannot weigh evidence, pass on credibility of witnesses, or substitute its judgment for that of the jury. Rougeau v. Commercial Union Ins. Co., 432 So.2d 1162 (La.App. 3d Cir.), writ denied 437 So.2d 1149 (La.1983), overruled on other grounds, Burleigh v. State Farm Ins., 469 So.2d 270 (La.App. 3d Cir.1985).
The trial judge in his reasons for JNOV stated that "speculation, guessing, and a mere possibility are not sufficient to sustain a verdict." He found the evidence presented in support of Joshua's claim to be speculative.
The basis of the claim for Joshua's award is that plaintiff was pregnant at the time of the accident, and injury was caused to the unborn child, Joshua. The primary basis for the award is Joshua's learning disability. However, plaintiff's problem in the instant case is a failure of a showing of causation between Joshua's disability and the accident. Plaintiff's leading expert witness concerning Joshua's disability was Vallee Kehoe, an educational consultant regarding learning disabilities and an expert in speech and language pathology. Kehoe felt that Stovall was learning impaired. She stated that she was not qualified to make a diagnosis as to the medical causation of the child's disability. She "guestimated" that the two most probable causes of Joshua's problem would be either brain damage or "environmental deprivation." She stated that the latter was a very common cause of this sort of problem. Ms. Kehoe also stated that environmental deprivation was an ongoing concern in Joshua's case due to lack of stimulation from his mother.
More importantly, there was no neurological testimony from a doctor in support of the plaintiff's theory of brain damage to Joshua. This child had never been examined by a neurologist or undergone any neurological tests. The only medical testimony indicated that Joshua was in all respects "normal." Further, there was no evidence that Joshua had suffered any impairment as a result of the accident. This record simply does not support any proof on causation. Accordingly, we cannot say the trial judge erred in granting a judgment notwithstanding the verdict regarding Joshua's award.
Having so concluded, we affirm that part of the judgment finding Gilbert and Nissan solidarily liable. We affirm also the judgment NOV denying recovery for Joshua Stovall. We delete, reverse and set aside the $239,313.92 award for a full time attendant. The apportionment of fault is modified to the extent of assessing 50% fault on the part of Melissa Gilbert and 50% fault on the part of Nissan. The quantum award in favor of plaintiff is amended and as amended is affirmed.
*1121 AFFIRMED IN PART, REVERSED IN PART, AMENDED IN PART AND AS AMENDED, AFFIRMED.
BARRY, J., dissents in part with reasons.
BARRY, Judge, dissenting in part with reasons.
The majority has tampered with the well-enunciated appellate review standard as to quantum. An appellate court should not disturb an award unless the record shows that the trier of fact abused its much discretion. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, 341 So.2d 332 (La.1976).
How can the majority conclude that the jury clearly abused its discretion when it awarded general damages of $1,849,798? What did the jury hear and see to support that award? Why is $1,000,000 more reasonable than $1,849,798?

GENERAL DAMAGES
Ms. Page suffered massive injuries below her waist. Her right femur was jammed into the hip socket area and her left leg was fractured below the knee. The sciatic nerve (deeply embedded behind the femur in the thigh) was severely damaged which resulted in a "drop" foot. Both kneecaps were smashed and her right foot was crushed, apparently by the floorboard. The impact forced the head of the left femur into the hip socket which was destroyed. The upper end of the femur was driven past the pelvic bone which required extensive traction.
The record shows that Ms. Page experienced eight surgical procedures, which included a total hip replacement, fusion of her right foot, and removal of her right kneecap. Her treating physician, Dr. Anastasio, stated that Ms. Page was permanently and totally disabled and would be ambulatory only with a walker. He said that she would live in continuous severe pain and be required to take drugs the rest of her life.
The jury heard and saw details of the injuries and medical testimony which substantiated the intensity of Ms. Page's pain and its predicted duration. The jury listened to testimony about the severity of the head-on crash and it had the best opportunity to evaluate the credibility of all witnesses.
This Court recently deferred to the jury's discretion in affirming $4,025,000 for past and future pain and mental anguish and loss of enjoyment of life for a crushed leg. Bernard v. Royal Insurance Company, 586 So.2d 607 (La.App. 4th Cir.1991), writ denied 589 So.2d 1058 (La.1991). On review the question is not whether a different award might have been more appropriate but "whether the award of the trial court or jury can be reasonably supported by the evidence." Bernard, 586 So.2d at 613.
Ms. Page, 36 years old, suffered tortuous, anguishing injuries which will affect her body during the next 40 years of her expected lifetime. The jury did not abuse its discretion in its assessment of the quantum.

J.N.O.V.
Ms. Page was three months pregnant when her lower body was crushed. The jury awarded $750,000 to her son, Joshua, who suffers from a severe speech and learning disability.
As a result of the accident, the unborn fetus was exposed to 21 x-rays plus more than 20 x-rays adjacent to Ms. Page's abdomen. While pregnant, Ms. Page was administered anesthesia during her operations and took numerous medications. The treating physician, Dr. Fortino, and two experts in the field of speech and learning disabilities testified that Joshua's impairments were attributable to the accident and the medical treatment received by Ms. Page.
The jury awarded $750,000 on behalf of Joshua; however, the trial judge granted a judgment notwithstanding the verdict (J.N.O.V.), which the majority has affirmed.
A J.N.O.V. is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the *1122 trial judge believes that reasonable men could not arrive at a contrary verdict, that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence in favor of the mover. All reasonable inferences or factual questions should be resolved in favor of the non-moving party. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991).
When there is a conflict in the testimony, any reasonable evaluation of credibility and reasonable inference of fact should not be disturbed on review, even though this Court may feel its evaluation is more reasonable. The factfinder's (jury's) choice between two permissible views cannot be manifestly erroneous or clearly wrong.
The trial judge erred in granting the J.N.O.V.
In summary, the majority has substituted its opinion on quantum for that of the jury, and the trial judge substituted his opinion as to Joshua's damages for that of the jury. Credible evidence supports the general damage award of $1,849,798 to Ms. Page and $750,000 on behalf of Joshua.
I respectfully dissent.
NOTES
[1] We arrived at the sum of $1,849,798.13 by subtracting the sums of $177,857.66 in stipulated medical expenses, $23,120.71 in projected prescriptive medicine costs, $459,909.58 in future earnings and benefits, and $239,313.92 for lifetime attendant care.